DECONCINI MCDONALD YETWIN & LACY, P.C.
2525 EAST BROADWAY BLVD., SUITE 200
TUCSON, AZ 85716-5300
(520) 322-5000

John C. Lacy (AZ # 2084)
jlacy@dmyl.com
Gary F. Urman (AZ # 11748)
gurman@dmyl.com
Marian C. LaLonde (AZ #25132
mlalonde@dmyl.com
Attorneys for Plaintiff VANE Minerals (US), LLC

### IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| VANE MINERALS (US), LLC, | ) |
| | ) Case No. 1:12-cv-00646-SGB |
| Plaintiff, | ) |
| | ) |
| v. | ) **RESPONSE TO MOTION TO** |
| | ) **DISMISS** |
| THE UNITED STATES OF AMERICA, | ) |
| | ) Judge Susan G. Braden |
| Defendant. | ) |

Plaintiff VANE Minerals (US), LLC ("VANE"), by and through its counsel undersigned, respectfully submits this response and opposition to the United States' Motion to Dismiss. The motion should be denied because VANE has terminated its involvement in related Arizona litigation. Moreover, the action is ripe because the Northern Arizona Withdrawal Order is a final administrative decision, from which VANE's causes of action and damages arise, and because mineral examinations of VANE's individual claims are not necessary to discern VANE's actionable harm.

**BACKGROUND**

**A.    Breccia Pipe Uranium Mining**

Within the "Arizona Strip," or the part of Arizona located north of the Colorado River, and in other areas within the Colorado River Plateau, commercially viable

concentrations of uranium are located within geological features known as breccia pipes. A breccia pipe is a vertical column of broken rock that has collapsed downward into an underground cavern beneath the plateau. A typical breccia pipe is approximately 300 feet in diameter and extends vertically underground approximately 2,000 to 3,000 feet. Northwest Arizona contains thousands of breccia pipes.

Not all breccia pipes contain uranium. Rather, it is estimated that between one and five out of 100 breccia pipes will contain commercially viable quantities of uranium. Where they occur, economic concentrations of uranium generally are found within the breccia pipe approximately 600 to 2,000 feet below the surface. The most widely accepted belief is that the uranium accumulated within the broken rock of the breccia pipes about 260 million years ago. It also is widely accepted that a much larger percentage of breccia pipes once hosted commercial quantities of uranium, but due to the high solubility of uranium in water, many deposits were simply leached by water, a process still occurring today. If the uranium does not come in contact with water, it remains intact.

The uranium deposits found within breccia pipes in Northern Arizona are among the highest grade in the world. The uranium deposits are confined to the breccia pipes, which means that the orebodies are limited in size. Exploratory drilling of breccia pipes in the 1980s revealed that, where ore grade uranium mineralization existed, the orebodies contained an average of 3.2 million pounds of uranium oxide or "yellowcake" (a number that may be considered to be small by large-scale mining standards). The limited size of the ore bodies means that any mines created to reach the ore are small operations and have a short life span (approximately two to four years), but nonetheless can be very profitable.

Procedures for mining uranium within breccia pipes were refined in the 1980s and 1990s. The mine is small, and generally about 20 acres are disturbed on the surface. The extraction occurs underground, and ore is trucked to a processing site in Utah. No ore is processed at the mine site. Once the orebody is mined, the mine shaft is backfilled with

waste rock stockpiled at the surface, the shaft is sealed, the mine's headframe and buildings are dismantled and removed, stockpiled soil is recontoured and the surface is reseeded and ultimately returned to its pre-mine use. Mines that operated in the 1980s and 1990s have been reclaimed so successfully that there is little evidence that mining ever occurred at that location.

**B.     VANE**

Plaintiff VANE Minerals (US), LLC is a Delaware limited liability company. Its offices are located in Tucson, Arizona. VANE is actively engaged in an exploration and development program designed to locate, delineate, and develop high-grade breccia pipe uranium deposits in Northern Arizona. Since October, 2004, VANE has invested more than $8.5 million in its uranium program.

VANE is committed to following mining practices that comply with all applicable laws and all restrictions and conditions imposed by governmental entities, and which result in as little impact to the land and environment as possible. VANE willingly and routinely incurs expenses to minimize the impact of its activities upon the environment, and takes pride in leaving behind little or no lasting environmental disturbances, so that the lands can be better enjoyed by other users. For example, sites in the Kaibab National Forest where VANE conducted exploratory drilling in 2008 were fully reclaimed with the approval of the Forest Service so that, today, it is difficult, if not impossible, to tell that any mineral exploration activities were conducted on the sites.

VANE owns 678 unpatented mining claims in Northern Arizona. Most of the claims are centered on or around known or suspected breccia pipes.

**C.     The Northern Arizona Withdrawal**

On July 21, 2009, notice was published in the *Federal Register* of Interior Secretary Kenneth Salazar's proposal to withdraw approximately 1 million acres in Northern Arizona from location and entry under the Mining Law for 20 years. 74 Fed. Reg. 35,887–88 (July

Response to Motion to Dismiss; Case No. 1:12-cv-00646-SGB

21, 2009). The Interior Secretary did so despite a Congressional determination in the Arizona Wilderness Act of 1984 that the lands subject to the current withdrawal had been adequately studied and found not to be eligible for withdrawal. Publication of this notice automatically segregated these acres from location and entry under the Mining Law for two years in order to enable the Bureau of Land Management ("BLM") to prepare an environmental impact statement concerning the proposed withdrawal. The lands that were segregated included 626,678 acres of land managed by the BLM, and located within the "Arizona Strip" portion of Northern Arizona, as well as 355,874 acres of land managed by the United States Forest Service, and located within the Tusayan Ranger District of the Kaibab National Forest south of the Grand Canyon National Park. The segregated lands collectively are referred to as the "Withdrawal Area." VANE's mining claims are located within the Withdrawal Area. The segregation drastically altered the legal ability of VANE, and others, to explore for and locate new claims and corroborate its discoveries and develop the valuable mineral deposits on its existing claims.

Before the segregation, VANE generally could engage in exploration operations on its existing claims either by submitting a notice of intent to the BLM or by submitting a plan of operations to the United States Forest Service. If the proposed activities satisfied applicable environmental criteria, VANE would be permitted to proceed. However, on segregated or withdrawn lands, the BLM and Forest Service now must prepare a mineral examination report to confirm the existence of a "mineral discovery" before operations may proceed. *See* 43 C.F.R. § 3809.100. Because the uranium orebody is located deep under the surface, it generally is not possible to demonstrate a "mineral discovery" without first performing extensive exploratory drilling on the claim to corroborate the discovery. In other words, VANE cannot perform exploratory drilling until it has demonstrated a mineral discovery, and it cannot demonstrate a mineral discovery until it has performed exploratory drilling. Pending a mineral examination, VANE would be limited to only casual use of its

claims. Casual use is generally limited to the use of hand-tools, and does not include the use of mechanized earth-moving equipment or drilling equipment. 43 C.F.R. § 3809.5. Needless to say, VANE cannot effectively explore or develop its mining claims located on the segregated lands.

At the time of the notice of segregation, VANE had submitted plans of operations to the United States Forest Service (the Forest Service, rather than the BLM, has jurisdiction over national forest lands within the Withdrawal Area) to conduct exploratory drilling on claims located by VANE within the Kaibab National Forest. When the notice of segregation was issued, the Forest Service notified VANE that, as a result of the segregation, no action could be taken on the pending plans of operations until the Forest Service conducted a mineral examination of each affected claim to determine the existence of a mineral discovery where VANE intended to drill.

The Forest Service took the position that, because of the withdrawal, VANE was required to demonstrate a "discovery" of minerals in such concentrations and quantities that it would be commercially reasonable to begin mining within each claim subject to the pending plans of operations. If VANE could make such a showing for a claim, using data that existed on the date of the notice of segregation, then consideration of the plans of operations would be permitted to proceed. On the other hand, if such a showing could not be made for a particular claim, then the entire claim would be invalidated by the Forest Service.

The problem with the impending mineral examinations is that, because the uranium is so deep underground, extensive drilling and other exploratory activities are required to demonstrate the existence of a "discovery," as defined by the Forest Service. VANE did not possess the data demanded by the Forest Service because it had not conducted the necessary drilling and other exploratory activities; in other words, the pending plans of

operations sought approval to conduct the very activities that were necessary to gather the data which would be needed before the activities would be approved.

Knowing that VANE previously did not have the opportunity to conduct necessary drilling and other exploration activities on the claims that were subject to its plans of operations, the Forest Service suggested that VANE withdraw its plans of operations. The alternative, VANE was told, would be mineral examinations and the likely invalidation of its claims. Faced with no real choice, VANE withdrew its plans of operations.

Had the segregation, and later the withdrawal, not been in effect, the Forest Service would not have required mineral examinations or demonstrations of mineral discoveries as a condition of approving VANE's plans of operations.

On January 9, 2012, Interior Secretary Salazar signed the Record of Decision ("ROD") for the Northern Arizona Withdrawal. That same day, Secretary Salazar also signed Public Land Order ("PLO") 7787, which implemented the ROD by withdrawing the Withdrawal Area from location and entry under the Mining Law for twenty years. 77 Fed. Reg. 2,563–66 (Jan. 9, 2012).

Like the segregation before it, the 20-year withdrawal drastically altered the legal regime under which VANE could explore for and locate new claims and corroborate its discoveries and develop the valuable mineral deposits on its existing claims.

But for the 20-year withdrawal, VANE would explore and develop its claims within the Withdrawal Area, and would do so without the fear of premature mineral examinations by the BLM or the Forest Service. As a result, the value of VANE's mining claims has significantly decreased. Moreover, VANE must pay annual fees to maintain its claims, even though it is effectively barred from developing them.

The 20-year withdrawal has resulted in significant financial impacts on VANE. Prior to the 2-year segregation and the 20-year withdrawal, VANE and other operators obtained substantial investor financing by representing an active presence in the

Response to Motion to Dismiss; Case No. 1:12-cv-00646-SGB

development of uranium resources. VANE undertook these activities, at great expense to itself and its investors, based on Congressional representations in the Arizona Wilderness Act of 1984 that the affected lands would remain open to multiple use, including mineral exploration. In addition to depriving VANE of the opportunity to recover its direct investment in its uranium exploration program totaling in excess of $8,500,000.00, as well as to add significant value and returns through the discovery and mining of uranium, VANE also has suffered an adverse impact on the value of its stock. Beginning with the announcement of the two-year segregation, VANE's stock price began to fall. The impact on VANE's share value from the two-year segregation and the subsequent 20-year withdrawal is estimated to be as much as $32,900,000.00. Finally, the BLM concluded in its Environmental Impact Statement for the Northern Arizona Withdrawal that, without the 20-year withdrawal, VANE's claims in the withdrawal area could be expected to result in no less than one producing mine. VANE's projected return from a single uranium deposit is approximately $94,000,000.00.

### D. The Arizona Litigation

Beginning in November, 2011, four lawsuits were filed in the United States District Court for the District of Arizona to challenge the validity of the Northern Arizona Withdrawal: *Yount v. Salazar, et al.*, No. 3:11-cv-08171-DGC; *National Mining Association, et al. v. Salazar, et al.,* No. 3:12-cv-08038-DGC; *Northwest Mining Association v. Salazar, et al.*, No. 3:12-cv-08042-DGC; and *Quaterra Alaska Inc., et al. v. Salazar, et al.*, No. 3:12-cv-08075-DGC. VANE filed motions to intervene as an additional plaintiff in the National Mining Association and Northwest Mining Association cases. VANE's motions to intervene were granted by the Arizona District Court and the actions were consolidated on August 20, 2012.

In the Arizona litigation, VANE and the other Plaintiffs alleged that the Northern Arizona Withdrawal was arbitrary and capricious because it relies on reasons for which

Response to Motion to Dismiss; Case No. 1:12-cv-00646-SGB

there is no scientific or factual evidence of findings; that there was no scientific evidence that uranium mining in the Northern Arizona withdrawal area would have adverse impacts on the land or water resources; that existing laws and rules fully protect wildlife and Native American cultural sites and resources; that based on existing science, the Defendants could not have rationally concluded that the Northern Arizona withdrawal was necessary to protect the environment; that the Secretary of the Interior was improperly predisposed and ignored the available facts and science in violation of the National Environmental Policy Act; that the Defendants have violated their statutory mandate under the Federal Land Policy and Management Act; and that the Northern Arizona withdrawal violates the Arizona Wilderness Act of 1984. The Plaintiffs requested injunctive and declaratory relief. The claims currently are pending.

On December 26, 2012, in response to the United States' motion to dismiss herein, VANE dismissed its claims in the Arizona litigation. A copy of VANE's dismissal notice is attached.

**ARGUMENT**

**A.     28 U.S.C. § 1500 Does Not Preclude This Action.**

The United States argues that, pursuant to 28 U.S.C. § 1500, this action should be dismissed because VANE is prosecuting a claim for declaratory and injunctive relief in the United States District Court for the District of Arizona styled *Yount v. Salazar*, CV11-8171-PCT-DGC (consolidated). The United States argues that VANE cannot prosecute actions in two different courts if the actions arise from the same operative facts, even if (as here) VANE is seeking different remedies from each court and the remedies sought in one court are not available in the other court. Unfortunately, the United States is correct. *See U.S. v. Tohono O'odham Nation*, 131 S.Ct. 1723, 1731 (2011). Therefore, VANE has elected to dismiss its claims in the Arizona District Court. A conformed copy of VANE's dismissal notice is attached.

---

Response to Motion to Dismiss; Case No. 1:12-cv-00646-SGB

8

With the dismissal of the competing litigation, this action is free to move forward without any jurisdictional impediment. *Young v. U.S.*, 60 Fed. Cl. 418 (2004); *Glick v. U.S.*, 25 Cl. Ct. 435 (1992). The United States' motion to dismiss for lack of jurisdiction should be denied.

### B. The Action Is Ripe.

A dispute is ripe for judicial action when an administrative decision has been formalized and its effects are felt in a concrete way by the challenging parties. *Abbot Laboratories v. Gardner*, 387 U.S. 136, 148-49 (1967). In the present case, a final and formal decision has been rendered by the Secretary of the Interior concerning the Northern Arizona Withdrawal. The decision is a final decision. There are no hearings left to be conducted, no more facts being gathered by the administrative agency, and no more administrative proceedings left to be conducted in connection with the Secretary's Public Land Order. Moreover, as has been demonstrated, the Secretary's decision is being felt by VANE in a concrete way. VANE has effectively lost its investment in Northern Arizona. VANE is unable to conduct exploratory drilling on its existing claims on the same terms as were available before the withdrawal. Without the ability to conduct exploratory drilling, VANE is precluded from demonstrating the existence of a mineral discovery (what the United States refers to as "VER") and thus is precluded from developing and profiting from its claims.

The United States argues that there still remains the task of determining the "validity" of VANE's 678 claims and, until these factual determinations are made, this action is not ripe. However, as already has been observed, performing mineral examinations to determine the existence of a mineral discovery on each of VANE's claims would be meaningless because it generally is not possible to demonstrate a mineral discovery without exploratory drilling and, under the withdrawal, the exploratory drilling is prohibited without a demonstrated mineral discovery. In every practical and legal way,

then, the withdrawal order has the effect of preventing VANE from making any meaningful mineral-related use of its 678 claims. The United States can perform 678 mineral examinations, or it can perform no mineral examinations at all; in either event the effect of the withdrawal order is precisely the same.

The United States has taken VANE's mining claims specifically because it has taken VANE's ability to explore the claims. These harms arise from the withdrawal order, a final and formal decision issued by the Secretary of the Interior. No number of mineral examinations will change this result. Because the offending government action is final, and because no other administrative action is necessary or available to temper (or to seal) VANE's harm, this action is ripe and should be permitted to proceed.

Moreover, this case presents a unique situation where the United States already has acknowledged the value of VANE's mining claims. In its Environmental Impact Statement for the Northern Arizona Withdraw, the United States chose a methodology for calculating the uranium endowment within the Northern Arizona Withdrawal area that quantifies the cumulative value of VANE's mining claims. *See* Complaint, Document 1, paragraphs 60-63. Accordingly, it is unnecessary to perform mineral examinations to determine whether VANE has been harmed or to determine the extent of VANE's damages.

It also should be noted that VANE has alleged an estoppel claim for damages based on exploration expenses incurred by VANE in Northern Arizona in reliance on government and Congressional representations that the lands on which VANE was investing would remain open to mineral exploration.[1] These damages, which are known and are liquidated, were fixed at the moment the withdrawal order was issued by Secretary Salazar. The performance of mineral examinations will not affect or change the nature of VANE's

---

[1] The United States argues that an estoppel claim must fail for lack of affirmative federal misconduct that violates federal law. However, the complaint herein alleges significant federal misconduct in connection with the Northern Arizona Withdrawal in violation of the Federal Land Policy and Management Act and the National Environmental Policy Act. In any event, the factual merits of Plaintiff's estoppel claim are not (nor should they be) the subject of this (or any) Motion to Dismiss.

Response to Motion to Dismiss; Case No. 1:12-cv-00646-SGB

reliance damages, or their amount.

Because the dispute is ripe for determination by the Court, the Motion to Dismiss should be denied.

**CONCLUSION**

The United States' Motion to Dismiss should be denied because VANE has terminated its involvement in all other litigation arising out of the same or similar facts and transactions that form the basis for VANE's claims herein. Therefore, there is no jurisdictional impediment under 28 U.S.C. § 1500 to proceeding in this action. Moreover, because the Northern Arizona Withdrawal order is a final administrative decision, because VANE's harm has been fixed by the order, and because mineral examinations proposed by the United States will not change the existence or extent of VANE's harm, this action is ripe for adjudication. For these and the foregoing reasons, VANE respectfully requests that the United States' Motion to Dismiss be denied.

DATED this 2nd day of January 2013.

DECONCINI MCDONALD YETWIN & LACY, P.C.

By: */s/ Gary F. Urman*
John C. Lacy
Gary F. Urman
Marian C. LaLonde
2525 E. Broadway Blvd., Suite 200
Tucson, AZ 85716-5300
Attorneys for Plaintiff

I:\FILES\DOCS\VANE04\120350\PLDG\NA4219.DOCX

Response to Motion to Dismiss; Case No. 1:12-cv-00646-SGB

**CERTIFICATE OF SERVICE**

I hereby certify that on the 2nd day of January, 2013, I caused the foregoing to be served upon counsel of record through the Court's electronic service system (ECF/CM).

By: /s/ *L.J. Andersen*